NEWMEYER & DILLION LLP
MICHAEL W. SHONAFELT, CBN 186853
Michael.Shonafelt@ndlf.com
JACQUELYN MOHR, CBN 278337
Jacquelyn.Mohr@ndlf.com
1333 N. California Blvd, Suite 600
Walnut Creek, California  94596
(925) 988-3200; (925) 988-3290 (Fax)

Attorneys for Plaintiff
CROWN CASTLE NG WEST LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CROWN CASTLE NG WEST LLC, a Delaware limited liability company,<br><br>    Plaintiff,<br><br>vs.<br><br>TOWN OF HILLSBOROUGH, a California municipality; CITY COUNCIL OF THE TOWN OF HILLSBOROUGH, its governing body; AND DOES 1-10,<br><br>    Defendants. | CASE NO.:<br><br>**PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR:**<br><br>**(1) Prohibition of Service – 47 USC § 332(c)(7)(B)(i)(II)**<br><br>**(2) Lack of Substantial Evidence – 47 USC § 332(c)(iii)**<br><br>**(3) Prohibitory Regulation of Rights-of-way – 47 USC § 253(a)**<br><br>**(4) State Preemption – Violations of California Public Utilities Code sections 7901 & 7901.1**<br><br>**(5) Due Process Violations – 42 U.S.C. § 1983**<br><br>**Entitled to Expedited Review – 47 U.S.C. section 332(c)(7)(B)(v)**<br><br>FILE DATE:<br>TRIAL DATE SET:   No Date Set |

NEWMEYER & DILLION LLP

COMPLAINT

By this Petition and Complaint ("Action") Petitioner and Plaintiff, Crown Castle NG West LLC ("Crown Castle") seeks a declaration of its rights and injunctive relief and/or writ of mandate to direct Respondents and Defendants, the Town of Hillsborough ("Town") and the City Council of the Town of Hillsborough ("City Council") (collectively, "Defendants"), to set aside their actions adopting a resolution of denial ("Resolution" or "Denial Resolution") of permit applications for installation of vital telecommunications infrastructure in the Town.

This case addresses a California municipality's attempt to exempt itself from federal and state laws that are intended to apply equally to all local governments in order to address overriding federal and state concerns, namely, the provision of a reliable national and statewide telecommunications network. Capitulating to political pressure exerted by a vocal minority of its residents, the Town ignored its statutory mandates and turned a blind eye to Crown Castle's federal and state rights, including Crown Castle's basic rights of due process. The result of the Town's actions is a de facto blanket prohibition on telecommunications facilities in the Town's public roads in violation of federal and state law, including the federal Telecommunications Act of 1996 and California Public Utilities Code section 7901, among others.

If a city can unilaterally decide that it is unique among all municipalities and declare itself immune from compliance with laws that apply to all other local governments, legislative actions intended to bind cities become devoid of force and meaning. Such cannot be the case; cities are not fiefdoms unto themselves. *Wilson v. City of Laguna Beach*, 6 Cal.App.4th 543, 561 (1992). In light of the above considerations, Crown Castle, hereby alleges as follows:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. sections 1331, 1337, 1367, 2201 and 2202 and 47 U.S.C. section 332.

2.      The Defendants are subject to the personal jurisdiction of this Court because they are located in this district.

3.      Venue is proper in this Court under 28 U.S.C. section 1391(b) in that the Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims herein occurred in this district.

4.      Crown Castle properly exhausted all of its administrative remedies prior to bringing this Action.  The Action therefore is ripe for review and it is timely under 47 U.S.C. section 332(c)(7)(B)(v).

**REQUEST FOR EXPEDITED REVIEW**

5.      Pursuant to 47 U.S.C. section 332(c)(7)(B)(v), Crown Castle seeks expedited review of this Action.

**THE PARTIES**

6.      Crown Castle is a limited liability company existing under the laws of the State of Delaware and doing business in the State of California.  Crown Castle is a state regulated telephone corporation and a public utility as defined by California Public Utilities Code, section 7901 ("Section 7901"). By virtue of the California Public Utilities Code Crown Castle is vested with a statewide franchise to "erect poles, posts, piers, or abutments for supporting the insulators, wires, and other necessary fixtures of their lines" in the public rights-of-way ("PROW") without having to obtain a municipal franchise or discretionary "fiat."  Cal. Pub. Util. Code, § 7901.  The California Public Utilities Commission ("PUC") has conferred on Crown Castle a "certificate of public convenience and necessity" ("CPCN") which certifies Crown Castle as a "competitive local exchange carrier" ("CLEC") and a public utility under the constitutionally granted regulatory authority of the PUC.  Because Crown Castle is a telephone corporation, a public utility and a CLEC, it benefits from the Section 7901 statewide franchise right.

7.      The Town is a municipal corporation existing under the laws of the State of California and located within the County of San Mateo.  The City Council is the legislative body that enacts and applies Town codes and regulations.

8.      Crown Castle is unaware of the true names and capacities of respondents named herein as Does 1 through 10, inclusive, ("Does") whether individual, corporate, associate, or otherwise, and therefore sues those respondents by such fictitious names.

9.      Crown Castle is informed and believes that the Does, and each of them, inclusive, are and were at all relevant times the agents, servants, employees, successors, predecessors, associates, and/or employees of each other and were acting within the course and scope of such

relationships and with the full knowledge and consent of each of the other respondents.

**THE TELECOM ACT**

10.    Congress enacted the Telecommunications Act of 1996 ("Telecom Act") "to promote competition and higher quality in American telecommunications services and to 'encourage the rapid deployment of new telecommunications technologies.'" *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005).

11.    In furtherance of its goal of facilitating the rapid deployment of telecommunications technologies, the Telecom Act imposes certain restrictions on the land use and zoning authority of local and state governments.  Among those restrictions are the following:

(a)    State and local governments "shall not unreasonably discriminate among providers of functionally equivalent services."  47 U.S.C. § 332(c)(7)(B)(i)(I).

(b)    State and local governments "shall not prohibit or have the effect of prohibiting the provision of personal wireless services."  *Id.* § 332(c)(7)(B)(i)(II).

(c)    State and local governments "shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time … ."  *Id.* § 332(c)(7)(B)(ii).

(d)    "Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."  *Id.* § 332(c)(7)(B)(i)(iii).

12.    If a state or local government takes any actions in violation of the above restrictions, an aggrieved person may bring an action against the governmental entity in a court of competent jurisdiction.  Such actions are to be heard "on an expedited basis."  *Id.* § 332(c)(7)(B)(v).

13.    The Telecom Act itself does not define the "reasonable period of time" within which a local government must take a final action on an application pursuant to 47 U.S.C. § 332(c)(7)(B)(ii).  In 2009, the FCC defined "reasonable period of time" to address unreasonable delays in the zoning process with the so-called "Shot Clock Rule."  In the Matter of Petition for Declaratory Ruling to Clarify Provisions of § 332(c)(7)(B) to Ensure Timely Siting Review, 24

FCC Rcd. 13994 (Nov. 18, 2009) ("Shot Clock Rule").

14.     The Shot Clock Rule "define[s] what constitutes a presumptively 'reasonable time' beyond which inaction on a personal wireless service facility siting application will be deemed a 'failure to act.'" Shot Clock Rule at 14000, ¶ 19.  The FCC determined that 90 days is "a generally reasonable timeframe for processing collocation applications" and 150 days is "a generally reasonable timeframe for processing applications other than collocations."  *Id*. at 14012, ¶ 45. "[I]f state or local governments do not act upon applications within those timeframes," the FCC concluded, "then a 'failure to act' has occurred and personal wireless service providers may seek redress in a court of competent jurisdiction."  *Id*. at 14005, ¶ 32.  The Shot Clock Rule timeline commences on the date the permit application is first submitted to the local government.

15.     The public policies underlying the Telecom Act have become exponentially more urgent and critical in the 21st century.  The following data points underscore that growing urgency:

     a.     In a recent international study, the United States dropped to fifteenth in the world in broadband penetration, well behind South Korea, Japan, the Netherlands and France.  Organization for Economic Co-operation and Development (OECD) Directorate for Science, Technology, and Industry, "Broadband Statistics," (June 2010). <www.oecd.org/sti/ict/broadband>.

     b.     Over 50 percent of all American homes are wireless only.  U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics (Released 05/2017);

     c.     More and more civic leaders and emergency response personnel cite lack of a robust wireless network as a growing public safety risk.  The number of 911 calls placed by people using wireless phones has significantly increased in recent years.  It is estimated that about 70 percent of 911 calls are placed from wireless phones, and that percentage is growing.  FCC (2012) http://www.fcc.gov/guides/wireless-911-services.

     d.     Data demand from new smartphones and tablets is leading to a critical deficit in

NEWMEYER & DILLION LLP

NEWMEYER & DILLION LLP

spectrum, requiring more wireless antennas and infrastructure.  According to a 2011 report, wireless data traffic was 110 percent higher than in the last half of 2010.  Similarly, AT&T reports that its wireless data volumes have increased 30-fold since the introduction of the iPhone.  Executive Office of the President Council of Economic Advisors (White House, Feb. 2012) at 2-6.

e.    Wireless data traffic grew by a factor of 300 percent between 2010 and 2015.  https://www.ctia.org/industry-data/wireless-quick-facts Global mobile data traffic is expected to reach a seven-fold increase by 2021.  http://digitalconqurer.com/news/cisco-mobile-visual-networking-index-vni-forecasts-seven-fold-increase-global-mobile-data-traffic-2016-21.

**CALIFORNIA PUBLIC UTILITIES CODE SECTIONS 7901 & 7901.1**

16.    The California Legislature enacted California Public Utilities Code section 7901 ("Section 7901," as defined above), to confer on telephone corporations a special statewide franchise to "erect poles, posts, piers, or abutments for supporting the insulators, wires, and other necessary fixtures of their lines" in the PROW without having to obtain discretionary planning and zoning processes imposed by local governments.  Cal. Pub. Util. Code, § 7901.

17.    For over one hundred years, the California Supreme Court has repudiated the claims of various local governments that a telephone corporation must obtain a local or municipal franchise, or grant-of-entry, to install its facilities in the PROW, holding that the matter of installing telephone facilities in the PROW is ***not*** "a municipal affair, but a matter of statewide concern."

18.    The California Supreme Court also has repeatedly held that the statewide franchise right conferred by Section 7901 is elevated to the heightened status of a "vested" right "which the constitutions, both state and federal, protect.  They cannot be taken away by the state, even though the legislature should repeal the section, or by the people through a constitutional provision."  See, e.g., *Postal Telegraph Cable Co. v. Railroad Commission*, 200 Cal. 463, 472 (1927).

19.    When it passed the Section 7901 statewide franchise right, the California

Legislature withheld from local governments the full slate of zoning powers ordinarily wielded by them.  The PROW carries a special status with respect to telephone corporations seeking to deploy their statewide networks.  That special status results in the preemption of any attempt by a local government to bar telecommunications facilities from the PROW and bars local attempts to require the equivalent of a local franchise as a precondition to entry into the PROW.

20.     California Public Utilities Code Section 7901.1 ("Section 7901.1") provides: "municipalities shall have the right to exercise reasonable control as to the time, place, and manner in which roads, highways, and waterways are accessed." As the words of the statute make clear, "time, place, and manner" governs only the accidents of "access" to the city streets and did not affect the basic right of access itself.  As such, Section 7901.1 does not operate to give local governments the authority to prohibit a telephone company's right to access under Section 7901. The statute only allows a locality "reasonable control as to the time, place, and manner in which roads, highways, and waterways are accessed."

21.     A local government decision that has the effect of prohibiting a telephone company's access to the PROW is in direct conflict with Sections 7901 and 7901.1. Section 7901 is an explicit statutory grant of a franchise to telephone companies to use the PROW. *Williams Communication v. City of Riverside*, 114 Cal.App.4th 642, 648 (2003) [upon obtaining a CPCN, a telephone corporation has "the right to use the public highways to install [its] facilities."].  Thus, a local government may not prohibit a telephone company from using the PROW as this would represent a clear conflict with Section 7901.

## FACTS

### The Project

22.     The wireless telecommunications facilities project at issue in this Action consists of 16 small cell antenna "nodes" with supporting electrical equipment and fiber optic lines ("Project") all located entirely within the PROW of the Town.  Each node comprising the Project integrates with the others to provide a larger wireless telecommunications network within the Town.  The Project nodes are distributed throughout the Town in a strategic fashion intended to fill critical service gaps in the Town.

23.     Each node site within the Project was selected by Crown Castle with the input and assistance of Town staff after careful analysis, site-walks with Town staff, design development and collaboration with the City Manager and the Town's hired experts.  The sites were chosen after extensive input from the Town staff as the least intrusive location to achieve the radio frequency ("RF") coverage objectives required for the location.

**Evolution of the Project**

24.     Crown Castle submitted an application for approval of the Project to the Town on January 4, 2017, pursuant to the Town's codified procedure for processing and approving applications for wireless telecommunications facilities.  *See* Town of Hillsborough Municipal Code ("HMC"), §§ 15.32, et seq.

25.     In the application and during the months following its submittal to the Town, Crown Castle repeatedly demonstrated with expert data and analysis that significant gaps in service exist throughout the Town and specifically in the area to be served by the Project.  The data establish levels of service that are either non-existent or well below any industry standard for 21st century telecommunications and broadband service.

26.     Crown Castle worked closely with the Town and the City Manager to select the sites for the Project nodes, focusing on sites recommended by Town staff.  To facilitate a continued collaboration between Crown Castle and the Town staff, at the Town's staff's request, Crown Castle twice extended the 150-day Shot Clock Rule deadline.

27.     The collaborative efforts of Crown Castle and the Town staff culminated in a staff recommendation of approval of all 16 nodes of the Project.  On October 31, 2017, the City Manager published "Public Notice of Proposed Action by the City Manager Approving the Installation of a Ground-Mounted Wireless Communications Facility ("WCF")" for each of the 16 nodes ("Approval Notices").  In each of the 16 Approval Notices, the City Manager briefly described the facility, confirmed the facility's consistency with the Town general plan and codes and provided notice to the Town residents that permits for the sites ***would be approved***.

28.     In each of the 16 Approval Notices, the City Manager made the same nine criterial findings in support of approval based on "substantial evidence contained in the Town's

NEWMEYER & DILLION LLP

administrative record, [which include]:

1.  The WCF and support structure additions and *modifications proposed are consistent with the general plan and will not adversely affect the policies and goals set forth therein or alter the rural character of the community*; and

2.  The applicant has shown that the *proposed WCF is necessary to close a significant gap in coverage* and has further shown that its proposed design, as modified by the Town, *is the least intrusive means of closing that significant gap*; and

3. The WCF and support structure modifications and additions to be permitted by the Town *comply with the design standards in the code, and other applicable provisions of the Code*; and

4. The WCF and support structure modifications and additions proposed comply with applicable safety codes and laws (including without limitation the American with Disabilities Act); and

5. The WCF and support structure modifications and *additions will not interfere with the public's use of rights-of-way, nor will they create undue risks to persons or property*; and

6. The applicant has demonstrated planned compliance with the FCC's radio frequency regulations, as the same may be amended; and

7. That the applicant is authorized to file the application proposed for this approval; and

8. The applicant *has or will have necessary local, state or federal regulatory approvals required* in connection with the WCF (including but not limited to necessary CEQA approvals, if any, and approvals for utility box design under this Code; and

9. The Town has determined that its alternative design approval, reducing the number of equipment cabinet bays from two to one, at the final recommended location *are more consistent with the general plan and otherwise minimizes* the impact of the WCF and support structure modifications and additions required as compared with the project originally submitted by the applicant."

(City Manager Approval Notice, emphasis supplied.)

**Growing Opposition and the City Manager's About-Face**

29.    When Town staff caught wind of growing opposition to the Approval Notices, its

NEWMEYER & DILLION LLP

1  newly appointed outside legal counsel, Christopher Diaz, hastened to call a town meeting with the

2  residents ("Town Meeting") and urged Crown Castle to extend the Shot Clock Rule deadline a

3  third time (to December 21, 2017) to allow the Town Meeting to proceed.

4      30.     Crown Castle agreed to the third extension of the Shot Clock Rule deadline in

5  good faith, but with reluctance, noting that: (a) it had already extended the Shot Clock Rule

6  deadline twice (for a total of 45 days); (b) the Town Meeting appeared to be an ad hoc procedural

7  requirement intended only to mollify an increasingly vocal and politically active minority of

8  Town residents who were stridently opposed to the Project; (c) the Town Manager had already

9  provided public notice that it would issue ministerial approvals of the Project; and (d) by

10  requiring the eleventh-hour Town Meeting, the Town's outside counsel was requiring Crown

11  Castle to comply with an additional step in the approval process -- a process *not* codified in any

12  ordinance, regulation or policy.

13      31.     The Town Meeting took place on December 7, 2017.  The Town Meeting

14  consisted only of an overview of the Project followed by several hours of comments from a cadre

15  of Project opponents who appeared dead set on stopping the Project at any cost.  The comments

16  included vocal tirades against the Town and Crown Castle and threats of political and legal action

17  if the Town approved the Project.

18      32.     A day before the expiration of the extended Shot Clock Rule deadline, on

19  December 20, 2018, and in a startling about-face from the Approval Notices, the City Manager

20  issued a "City Manager's Decision" denying all 16 sites ("City Manager's Denial").  The City

21  Manager gave Crown Castle no warning or notice about its abrupt change in position prior to the

22  issuance of the City Manager's Denial, and thus Crown Castle had no opportunity to work with

23  the City Manager to address the issues raised in the City Manager's Denial.  The City Manager's

24  Denial was particularly surprising, given the seemingly collaborative spirit that had characterized

25  the long working relationship between Town staff and Crown Castle up to that point in time.

26      33.     The City Manager's Denial denied all 16 applications.  The City Manager posted

27  two letters purporting to support the conclusions of the denial with "evidence."  The first letter

28  contended the Project did not undergo review pursuant to the California Environmental Quality

NEWMEYER & DILLION LLP

Act (Cal. Pub. Resources Code, § 21000, et seq.) ("CEQA") -- a spurious assertion on its face, since, among other things, CEQA places the burden on the Town to undertake CEQA review, not the applicant.  In any event, on January 16, 2018, the PUC -- which has concurrent jurisdiction over the Project -- declared the Project to be exempt from CEQA review pursuant to the CEQA "Class 3 Exemption."  (Cal. Code Regs., tit. 14, § 15300(d) ("CEQA Guidelines")).  The CEQA exemption constitutes a legal determination that the Project did not give rise to any significant environmental impact, including aesthetic impacts.  The Town never challenged the PUC's CEQA determination and is time-barred from doing so now.

34.    The second letter, submitted sometime after the posting of the City Manager's Denial, consisted of approximately ten pages of conclusory assertions intended to explain the City Manager's flip-flop on the prior findings of approval.  With **no** convincing rationale or evidence (substantial or otherwise), the City Manager's Denial simply reversed its prior conclusions on nearly every evidentiary finding in its Proposed Approval Notice as follows:

| No. | Proposed Approval Notice Finding | City Manager's Denial Finding |
|---|---|---|
| 1 | The WCF and **support structure additions and modifications proposed are consistent** with the general plan and will **not adversely affect** the policies and goals set forth therein or alter the rural character of the community. | … the Applicant **has not shown** that the WCF and support structure additions and modifications proposed **are consistent with** the general plan. Applicant **has also failed to show that its proposal will not**: (a) **adversely affect the policies and goals set forth in the general plan; or (b) alter the rural character of the community**. |
| 2 | The applicant has shown that the **proposed WCF is necessary to close a significant gap in coverage** and has further shown that its proposed design, as modified by the Town, **is the least intrusive means of closing that significant gap.** | …the **Applicant has not shown there is a significant gap in coverage**. If the Applicant had shown a significant gap in coverage, the City Manager would have found that the Applicant's proposal **is not the least intrusive means** of closing that significant gap. |

NEWMEYER & DILLION LLP

| 3 | The WCF and support structure modifications and additions to be permitted by the Town **comply with the design standards in the code, and other applicable provisions of the Code.** | …the Applicant **has not shown** the WCF and support structure modifications and additions proposed, **comply with the design standards in Chapter 15.32, and other applicable provisions of the Code**. |
|---|---|---|
| 5 | The WCF and support structure modifications and additions **will not interfere with the public's use of rights-of-way, nor will they create undue risks to persons or property**. | The City Manager finds that the WCF and support structure modifications and additions **interfere with the public's use of rights-of-way, or create undue risks to persons or property**. This is particularly evident with respect to the applications for new poles and above ground equipment. |
| 8 | The applicant **has or will have necessary local, state or federal regulatory approvals required** in connection with the WCF (including but not limited to necessary CEQA approvals, if any; and approvals for utility box design under this Code. | The City Manager finds that the Applicant **has failed to satisfy its burden of proof** for this finding... |
| 9 | The Town has determined that its alternative design approval, reducing the number of equipment cabinet bays from two to one, at the final recommended location **are more consistent with the general plan and otherwise minimizes** the impact of the WCF and support structure modifications and additions required as compared with the project originally submitted by the applicant. | the proposed WCFs and support structure modifications comprising the DAS project **are not consistent with the general plan and do not minimize the impact**s. Even assuming all the proposed WCF and support structure modifications and additions were required, the City Manager **would find that alternative designs or locations would be more consistent with the general plan and otherwise minimize the impacts**. |

35.     The about-face taken in the City Manager Denial bore the hallmarks of a capitulation to the "heckler's veto" of a vocal minority of the Town residents.  The City Manager's Denial was devoid of legal or evidentiary support and qualifies as a de facto blanket prohibition in violation of 47 U.S.C. sections 253 and 332 (c)(7)(B)(i)(II), among other laws.  The City Manager's Denial further violated Crown Castle's statewide franchise rights under Public Utilities Code section 7901 by barring Crown Castle from the Town's PROW.

NEWMEYER & DILLION LLP

**Crown Castle's Appeal of the City Manager's Denial**

36.    On January 3, 2018, Crown Castle filed a timely appeal of the City Manager's Denial of the Applications to the City Council pursuant to HMC § 15.32.090 ("Appeal").  The Appeal was the final avenue of administrative redress in the Town.  To allow the Appeal to proceed, Crown Castle agreed to extend the Shot Clock Rule deadline a fourth time, to March 31, 2018.

37.    The Town scheduled the hearing on the Appeal for March 12, 2018.  Two times prior to that date -- on January 8, 2018, and again on February 12, 2018 (and later, on March 12, 2018) -- the City Council convened in closed session to discuss "one potential case" that represented "[s]ignificant exposure to litigation."  The City Council failed to disclose the nature of the litigation or otherwise explain why it could not do so, in violation of the open meeting requirements of the Brown Act (Cal. Gov. Code, §§ 54950, et seq.).

38.    Crown Castle was concerned that the pre-hearing closed sessions were to discuss the Town's perceived threat of litigation from Crown Castle arising from the City Manager's Denial.  No litigation was pending at all at the time the closed sessions were called, however.  Nor should the City Council have perceived even a threat of litigation without first allowing an open and public hearing to allow both Crown Castle and the Project opponents to present their evidence and testimony on the record.  The fact that the City Council met outside of public view and without the required public disclosure appeared to reveal an adversarial stance vis-à-vis Crown Castle *before* a hearing on the merits and casts a pall of pre-existing bias over the Appeal proceedings.  *See Woody's Group v. City of Newport Beach*, 233 Cal.App.4th 1012 (2015).  Crown Castle intends to amend this Petition and Complaint to add Brown Act claims after invoking the necessary pre-litigation processes prescribed by that state statute.  Crown Castle intends to seek appropriate relief, including attorneys' fees, associated with those claims.

**The City Council's Rubber-Stamp of the City Manager's Denial**

39.    On March 12, 2018, the City Council convened to consider the Appeal.  The meeting consisted of approximately two hours of statements by many of the same Project opponents that appeared at the Town Meeting.  Crown Castle was limited to 15-minutes to

present its case and only ten minutes of rebuttal time.  Among other things, Crown Castle's

attorney, Michael Shonafelt, observed that: (a) the limited rebuttal time was not sufficient to

address the myriad issues raised by the Project opponents; and (b) that the Town had never

presented Crown Castle with specific alternative designs and/or locations that might address the

wide-ranging concerns raised by the City Manager and the Town residents.

40.     When the City Council closed the public hearing for deliberations, the City

Council members -- with apparent coaching by the Town's outside legal counsel -- each recited a

litany of conclusory musings and assertions supporting the Project opponents and the City

Manager's Denial.  The City Council then directed staff to write up a resolution of denial

("Denial Resolution") to be adopted later.

41.     On March 26, 2018, the Town's outside counsel presented the Denial Resolution

to the City Council for a vote.  The Denial Resolution consisted of a series of written findings

seemingly intended to prop up the City Council's deliberations on March 12, 2018, with post-hoc

legal justifications.  Because the City Council had closed the public hearing on March 12, 2018,

Crown Castle was precluded from making any response, rebuttal or comment to the Denial

Resolution for inclusion the administrative record.  The City Council voted unanimously to adopt

the Denial Resolution.

42.     The Denial Resolution constitutes a blanket denial of all 16 applications without

individual analysis of each application.  The grounds for the denials adopted by the City Council

are legally invalid and do not rest on substantial evidence in violation of federal, state and local

law.  The grounds for denial are vague and conclusory and exceed the Town's authority to

regulate Crown Castle's right to install critical telecommunications infrastructure in the Town.

43.     The circumstances surrounding the adoption of the Denial Resolution reveal a

process calculated to foreclose efforts by Crown Castle to meaningfully address the Town's

concerns.  Rather, the Denial Resolution was passed in an effort to justify a pre-determined

outcome.

//

//

**FIRST CLAIM FOR RELIEF**

**(Violation of 47 U.S.C. § 332(c)(7)(B)(i)(II) -- Unlawful Prohibition of Services, against All Defendants)**

44.     Crown Castle incorporates herein by this reference, as though fully set forth, each and every allegation contained above.

45.     The Telecom Act mandates that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services."  47 U.S.C. § 332(c)(7)(B)(i)(II).

46.     A state or local government violates section 332(c)(7)(B)(i)(II) "if it prevent[s] a wireless provider from closing a 'significant gap' in service coverage."  *T-Mobile USA Inc. v. Town of Anacortes*, 572 F.3d 987, 995 (9th Cir., 2009).  A violation of this provision arises upon a showing that:  (a) a "significant gap" in service coverage exists in the area to be served by the proposed facility; and (b) that the proposed facility is the "least intrusive means" of filling that coverage gap. *Id.*

47.     Crown Castle presented substantial evidence to demonstrate the existence of a significant gap in service coverage in the Project area.  The evidence provided by Crown Castle consisted of data collected by RF experts that revealed marginal to zero coverage throughout the Town.  The Town failed to present any competent or credible data or evidence -- substantial or otherwise -- to refute Crown Castle's demonstration of significant gap.  Nor does the Town have competent expertise or authority to determine Crown Castle's RF coverage objectives.

48.     Crown Castle demonstrated that the Project is the least intrusive means of filling the significant gap in service coverage.  Indeed, the site and designs were chosen after extensive input from the community and the Town staff as the least intrusive locations and designs to fill the significant service gap in the Town.  The Town cited no substantial evidence to refute Crown Castle's demonstration of least intrusive means.  Nor did the Town offer any other potentially feasible alternative for Crown Castle to consider as an alternative, as it is required to do to rebut Crown Castle's demonstration of least intrusive means.  Having failed to do so, it has failed to

rebut Crown Castle's demonstration of least intrusive means. See, e.g., *T-Mobile U.S.A. Inc. v. Town of Anacortes* 572 F.3d 987, 998 (9th Cir. 2009) ["[w]hen a locality rejects a prima facie showing, it must show that there are some potentially available and technologically feasible alternatives."].

49.     The Denial Resolution therefore prohibits and/or has the effect of prohibiting the provision of personal wireless services in violation of section 332(c)(7)(B)(i)(II).

50.     A controversy has now arisen between Crown Castle and the Defendants and/or Does 1 through 10, and each of them, in that Crown Castle alleges that the Defendants and/or Does 1 through 10, and each of them, have violated section 332(c)(7)(B)(i)(II). It would be fair, just and equitable for the Court to determine such rights between the parties.

51.     Crown Castle has been adversely affected by the above-described violations of law and Crown Castle has a clear right to relief. The Town has a mandatory duty to take action to correct those violations. Crown Castle has no other adequate relief available to it. Crown Castle has been adversely affected by the above-described violations of law. Unless and until enjoined by this Court, Crown Castle will continue to be adversely affected, and Crown Castle has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### (Violation of 47 U.S.C. § 332(c)(7)(B)(iii) – Lack of Substantial Evidence, against All Defendants)

52.     Crown Castle incorporates herein by this reference, as though fully set forth, each and every allegation contained above.

53.     47 U.S.C. § 332(c)(7)(B)(iii) provides that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

54.     The Town's findings that form the basis of the Denial Resolution are conclusory, vague, and contradictory and do not rise to the level of substantial evidence under federal, state or local law. The Denial Resolution's sweeping claims of aesthetic and other impacts stand in

NEWMEYER & DILLION LLP

contradiction to the PUC's Class 3 CEQA exemption -- which is a legal determination that the Project does not give rise to any significant impacts.  The Town never contested or challenged that determination.  The Town's prejudicial hearing procedures, which thwarted Crown Castle's ability to present rebuttal evidence and otherwise make a case for approval of some alternative version of the applications, all contributed to undermine the Town's evidentiary bases for the Denial Resolution.  Moreover, the Town's claims that no significant gap in service exists in the Town are devoid of any credible date and evidence and otherwise are not within the Town's authority or competence.  The City Council abused its discretion.  The Denial Resolution was not supported by substantial evidence in a written record and therefore violate section 332(c)(7)(B)(iii).

55.     A controversy has now arisen between Crown Castle and the Defendants and/or Does 1 through 10, and each of them, in that Crown Castle alleges that the Defendants and/or Does 1 through 10, and each of them, have violated section 332(c)(7)(B)(iii).  It would be fair, just and equitable for the Court to determine such rights between the parties.

56.     Crown Castle has been adversely affected by the above-described violations of law and Crown Castle has a clear right to relief.  The Town has a mandatory duty to take action to correct those violations.  Crown Castle has no other adequate relief available to it.  Crown Castle has been adversely affected by the above-described violations of law.  Unless and until enjoined by this Court, Crown Castle's rights will continue to be adversely affected, and Crown Castle has no adequate remedy at law.

**THIRD CLAIM FOR RELIEF**

**(Violation of 47 U.S.C. § 253 – Prohibitory Regulation of Public Right-of-Way, against All Defendants)**

57.     Crown Castle incorporates herein by this reference, as though fully set forth, each and every allegation contained above.

58.     47 U.S.C. § 253(a) provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a)

59.     The Town's ordinances, regulations and procedures are onerous, confusing, and prejudicial to Crown Castle.  They purport to confer more authority on the Town staff and decision-makers than is allowed by federal and state law.  They impose an unreasonably high bar to obtain approvals, and therefore have the effect of prohibiting the provision of telecommunications service in violation of section 253(a).  The Town's ordinances also are inherently discriminatory, as they impose prohibitory barriers on telephone corporations like Crown Castle, but do not impose such barriers on other public utilities in the PROW, in violation of 47 U.S.C. § 253(c).

60.     Crown Castle has been adversely affected by the above-described violations of law and Crown Castle has a clear right to relief.  Unless and until enjoined by this Court, Crown Castle's rights will continue to be adversely affected, and Crown Castle has no adequate remedy at law.

**FOURTH CLAIM FOR RELIEF**

**(State Preemption – Public Utilities Code §§ 7901 and 7901.1, against All Defendants)**

61.     Crown Castle incorporates herein by this reference, as though fully set forth, each and every allegation contained above.

62.     The California Legislature has declared that the matter of the installation of telecommunications facilities in the PROW by telephone corporations, including CLECs such as Crown Castle, is unequivocally a matter of statewide -- not municipal -- concern.  The Legislature intended to occupy the field in this matter, to the exclusion of municipal regulation.  Pursuant to Section 7901, local governments, such as the Town, are limited only to controlling the time, place and manner of access to the PROW.  Local governments are prohibited from adopting any ordinance or regulation purporting to impose their regular zoning and land use authority in excess of those limited time, place and manner powers.

63.     The CPUC has issued a CPCN which authorizes Crown Castle to construct the Project pursuant to its regulatory status under state law.  Crown Castle's special regulatory status as a CLEC gives rise to a vested right under Public Utilities Code section 7901 to use the PROW in the Town to "construct … telephone lines along and upon any public road or highway, along or

NEWMEYER & DILLION LLP

across any of the waters or lands within this State" and to "erect poles, posts, piers, or abutments for supporting the insulators, wires, and other necessary fixtures of their lines, in such manner and at such points as not to incommode the public use of the road or highway[.]" Cal. Pub. Util. Code, § 7901.

64.     The Town has violated section 7901 in at least two ways. First, by requiring Crown Castle to comply with the Town's onerous and prohibitive ordinances and requiring Crown Castle to obtain a fully discretionary permit -- the equivalent of a conditional use permit -- as a precondition to entry into the PROW, the Town and its ordinances violate Crown Castle's existing vested rights to enter the PROW, pursuant to section 7901. Second, by adopting the Denial Resolution, the Town exercised authority in excess of the limited time, place and manner controls ceded to local governments by the People of the State of California through enactment of Section 7901.

65.     A discretionary use permit -- like the permit required by the Town in this case -- constitutes an unlawful precondition for a CLEC's entry into the PROW because, as a matter of law, a discretionary, conditional use permit process presumes that the applicant has no pre-existing rights to the use that is being sought by the permit. In this case, Crown Castle has a pre-existing vested statewide right to enter the PROW for its telecommunications uses. The Town's discretionary use permit requirement wholly ignores this pre-existing right. It is the equivalent of a prohibited franchise requirement.

66.     Moreover, the Denial Resolution also directly violates Section 7901.1, as the Denial Resolution imposes restrictions that go beyond the reasonable time, place and manner restrictions and, instead, bar Crown Castle from installing *any* facility in the PROW. The Town's controls cannot have the effect of foreclosing use of the PROW or otherwise prevent Crown Castle from exercising its right under state law to "erect poles" in the PROW. Through its Denial Resolution, the Town is effectively prohibiting all facilities in the PROW, and thereby attempting to wield authority it does not have. The restrictions themselves, as well as the prohibitory collective effect of the restrictions, directly collide with sections 7901 and 7901.1.

67.     For the above reasons, the Town's Denial Resolution are preempted by State law

1    under the doctrines of express, field and/or conflict preemption and therefore are void as a matter

2    of law.  As a result of the Town's actions, Crown Castle has no other adequate relief available to

3    it.  Crown Castle has been adversely affected by the above-described violations of law.  Unless

4    and until enjoined by this Court, Crown Castle's rights will continue to be adversely affected, and

5    Crown Castle has no adequate remedy at law.

6                              **FIFTH CLAIM FOR RELIEF**

7              **(Due Process -Violation of 42 U.S.C. § 1983, against All Defendants)**

8           68.     Crown Castle incorporates herein by this reference, as though fully set forth, each

9    and every allegation contained above.

10          69.     The Town and the City Council are considered "persons" as defined by 42 U.S.C.

11   section 1983 and, at all times mentioned herein, took actions towards Crown Castle under color of

12   authority or state law.  Therefore, the Town and the City Council can be liable for damages for

13   discrimination, violations of substantive and/or procedural due process as guaranteed by federal

14   law and the United States Constitution.

15          70.     As alleged in more detail above, the Town and the City Council devised and

16   implemented a blanket prohibition against Crown Castle's Project before an unbiased and

17   objective hearing on the merits.  They determined to foreclose Crown Castle's ability to

18   adequately respond to the Town's concerns in any meaningful way. The City Council had a pre-

19   existing bias and intended to deny the applications before Crown Castle had an opportunity to

20   present its case in the Appeal.  The contradictory and generalized bases for denial for the sites

21   constituted a post-hoc rationalization that demonstrate pre-existing bias against the Project.  In so

22   doing, the City Council deprived Crown Castle of its rights to due process and equal protection.

23          71.     In addition to the above, the City Council failed to provide adequate hearings and

24   forums for the review of Crown Castle's Appeal, thus depriving Crown Castle of both substantive

25   and procedural due process in violation of law.  Crown Castle was denied a meaningful

26   opportunity to present its case to the City Council or otherwise provide a response to the Project

27   opponents.  Though no vote had been taken, denying the applications was already a *fait accompli*,

28   rendering the public hearing a pretense.

NEWMEYER & DILLION LLP

72.     As a direct and proximate result of the City Council's violations of Crown Castle's constitutional rights, Crown Castle has incurred monetary damages in an amount that has not yet been ascertained, but is believed to be in excess of the jurisdictional limits of this Court and will be determined according to proof at the time of trial.

73.     In addition to the damage and/or compensation claims above, Crown Castle is also entitled to recover, and hereby claim the recovery of its litigation expenses, including costs, attorneys' fees, and experts' fees pursuant to 42 U.S.C. section 1983.

## PRAYER FOR RELIEF

WHEREFORE, Crown Castle prays for judgment against Defendants as follows:

1.     As to the First, Second and Third Claims for Relief:

(a)     For an order declaring the Denial Resolution to be void and unlawful, invalid and unenforceable as a matter of law;

(b)     For an order requiring Defendants to approve Crown Castle's applications for the Project and to issue any and all necessary land use approvals for the Project.

(c)     For permanent injunctions and/or a writ of mandate compelling Defendants to rescind, revoke and set aside the Denial Resolution.

(d)     For permanent injunctions and/or a writ of mandate compelling Defendants to approve Crown Castle's applications for the Project and to issue any and all necessary land use approvals for the Project.

2.     As to the Fourth Claim for Relief:

(a)     For an order declaring the Denial Resolution to be void and unlawful, invalid and unenforceable as a matter of law;

(b)     For an order requiring Defendants to approve Crown Castle's applications for the Project and to issue any and all necessary land use approvals for the Project.

(c)     For permanent injunctions and/or a writ of mandate compelling the City Council to rescind, revoke and set aside the Denial Resolution.

(d)     For permanent injunctions and/or a writ of mandate compelling Defendants to approve Crown Castle's applications for the Project and to issue any and all necessary land use

NEWMEYER & DILLION LLP

1   approvals for the Project.

2       3.     As to the Fifth Claim for Relief:

3         (a)     For an order declaring the Denial Resolution to be void and unlawful,

4   invalid and unenforceable as a matter of law;

5         (b)     For an order requiring Defendants to approve Crown Castle's applications

6   for the Project and to issue any and all necessary land use approvals for the Project;

7         (c)     For permanent injunctions and/or a writ of mandate compelling the City

8   Council to rescind, revoke and set aside the Denial Resolution;

9         (d)     For compensatory damages in an amount to be proven at trial;

10        (e)     For prejudgment and post judgment interest as allowed by law;

11        (f)     For litigation expenses including reasonable attorneys' and expert's fees,

12   pursuant to 42 U.S.C. § 1983;

13        (g)     For costs of suit incurred herein; and

14        (h)     For such other relief as the court deems just and proper

15       4.     As to all claims for relief:  for attorneys' fees to the extent allowed by federal

16   and/or state law, including but not limited to pursuant to California Code of Civil Procedure

17   section 1021.5, and any other relief deemed appropriate by the Court and for the costs of the suit

18   herein.

19

20   Dated: April 25, 2018               NEWMEYER & DILLION LLP

21

22                            By:/s/Jacquelyn Mohr

23                            Michael Shonafelt

24                            Jacquelyn Mohr
                                Attorneys for Plaintiff
25                            CROWN CASTLE NG WEST LLC

26

27

28

NEWMEYER & DILLION LLP